# EXHIBIT 1

# In the Matter Of:

# SHIMMEL, ET AL. vs LIEUTENANT MOODY, ET AL.

## MICHELLE RENEE SHIMMEL

### April 25, 2019

*Prepared for you by*



**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF MICHIGAN
 3                    SOUTHERN DIVISION
 4
 5    STEVEN VANCE SHIMMEL
 6    by Personal Representative,
 7    ROBERT SHIMMEL,
 8            Plaintiffs,
 9      vs.              Case No. 1:18-cv-13334
10                       Hon. Laurie J. Michelson
11    LIEUTENANT JOHN MOODY,
12    DEPUTY ADAMCZYK, DEPUTY
13    JASON JAMES, DEPUTY AMY
14    VERRAN and DEPUTY JENNIFER
15    MORDE, Jointly and Severally.
16            Defendants.
17    _____
18
19
20       The Deposition of MICHELLE RENEE SHIMMEL,
21       Taken at 8161 South Saginaw Street,
22       Grand Blanc, Michigan,
23       Commencing at 1:32 p.m.,
24       Thursday, April 25, 2019,
25       Before Valerie Jo Lohr, CSR-6212.
```

Page 2

```
 1   APPEARANCES:
 2
 3   NEAL J. WILENSKY
 4   Law Office of Neal J. Wilensky, PC
 5   6005 West St. Joseph
 6   Suite 303
 7   Lansing, Michigan 48917
 8   (517) 323-1111
 9   cindykwlaw@gmail.com
10       Appearing on behalf of the Plaintiffs.
11
12   TODD J. SHOUDY
13   Fletcher, Fealko, Shoudy & Francis, PC
14   1411 Third Street
15   Suite F
16   Port Huron, Michigan 48060
17   (810) 987-8444
18   tshoudy@fletcherfealko.com
19       Appearing on behalf of the Defendants.
20
21
22
23
24
25
```

Page 3

```
 1                    TABLE OF CONTENTS
 2
 3   WITNESS                                      PAGE
 4   MICHELLE RENEE SHIMMEL
 5
 6   EXAMINATION
 7   BY MR. SHOUDY:                                  4
 8   EXAMINATION
 9   BY MR. WILENSKY:                               50
10
11                       EXHIBITS
12
13   EXHIBIT                                      PAGE
14   (Exhibits not offered.)
```

Page 4

```
 1   Grand Blanc, Michigan
 2   Thursday, April 25, 2019
 3   1:32 p.m.
 4
 5              MICHELLE RENEE SHIMMEL,
 6       was thereupon called as a witness herein, and
 7       after having first been duly sworn to testify
 8       to the truth, the whole truth and nothing but
 9       the truth, testified as follows:
10                    EXAMINATION
11   BY MR. SHOUDY:
12   Q.  Okay. Let the record reflect that this is the
13       deposition of Michelle Shimmel.
14   A.  Correct.
15   Q.  Taken pursuant to notice as to date and time and
16       location and is to be used for all purposes permitted
17       under the Federal Rules of Evidence and the Federal
18       Rules of Civil Procedure.
19              Miss Shimmel, I appreciate you being here
20       today. And as I understand it, you're appearing
21       voluntarily?
22   A.  Yes.
23   Q.  Could you please state your full name for the record.
24   A.  Michelle Renee Shimmel.
25   Q.  And, ma'am, have you given a deposition before?
```

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

Page 5

1   A.   No, I have not.
2   Q.   All right. So let me just go through the basic ground
3        rules of the deposition process so we're all on the
4        same page. First of all, as I introduced myself to you
5        earlier, I'm the attorney representing Deputy John
6        Moody, Deputy Adamczyk, Deputy Jason James, Deputy Amy
7        Verran and Deputy Jennifer Morden in a lawsuit that was
8        filed by Robert Shimmel on behalf of your late father,
9        Steven Shimmel. Okay?
10  A.   Okay.
11  Q.   As you can see, everything that we say and everything
12       I'm saying and everything you'll be saying will be
13       taken down by the court reporter who's sitting just to
14       your left.
15  A.   Okay.
16  Q.   Because she's taking down everything that we say, we
17       have to make sure we communicate verbally.
18  A.   Okay.
19  Q.   So, for example, if I ask you a question that calls for
20       a yes or no answer, a head nod or a head shake or an
21       huh-huh or uh-huh are insufficient for the court
22       reporter, okay?
23  A.   Okay.
24  Q.   If you give me that type of response, I'll prompt you
25       to verbalize your answer, okay?

Page 6

1   A.   Okay.
2   Q.   Now, if I ask you a question and you don't understand
3        the question, will you please let me know?
4   A.   Yes.
5   Q.   That's important. Because if you answer the question,
6        we're going to assume that you understood the question,
7        okay?
8   A.   Right. Correct. Okay.
9   Q.   Now, from time to time the lawyer representing your
10       father's estate may place objections on the record.
11  A.   Okay.
12  Q.   And we're not sitting before a judge who can rule on
13       those objections, so the procedure we use at a
14       deposition is I may prompt you to answer the question
15       over the objection if you can, okay?
16  A.   Okay.
17  Q.   If you need to take a break for any reason, will you
18       please let me know?
19  A.   Uh-huh.
20  Q.   Yes?
21  A.   Yes. Sorry.
22  Q.   That's all right. Everybody does it.
23            And if you need to take a break, we'll find a
24       good place to break.
25  A.   Okay.

Page 7

1   Q.   It might not be in the middle of a question, that type
2        of thing, okay?
3   A.   Okay.
4   Q.   Is there any reason you can't give your best testimony
5        today?
6   A.   No.
7   Q.   All right. And, ma'am, what's your current address?
8   A.   3476 West Dayton, D-a-y-t-o-n, Street, Flint, Michigan,
9        48504.
10  Q.   And how long have you lived at that address?
11  A.   I've been here since July of 2018.
12  Q.   Okay. And is that a rental?
13  A.   Yes. I'm currently looking for somewhere else to
14       reside right now.
15  Q.   Sure. And I think you indicated you have three
16       children under the age of two?
17  A.   Correct.
18  Q.   Or two and under?
19  A.   Yeah, two and under.
20  Q.   Anyone else live with you at that address?
21  A.   My fiance.
22  Q.   And what's your fiance's name?
23  A.   Randall James, common spelling for both.
24  Q.   Is Mr. James the father of one or more of the children?
25  A.   Yes. He's the father of my two youngest.

Page 8

1   Q.   Okay. And what's your age, ma'am?
2   A.   I am 23.
3   Q.   And your educational background?
4   A.   I am currently in school right now trying to obtain my
5        high school diploma through an alternative school. I
6        made it to eleventh grade. I was in school, and my
7        father passed away, and I dropped out because it was
8        too hard for me to attend.
9   Q.   Okay. So what high school did you start at?
10  A.   Carman-Ainsworth High School.
11  Q.   So at Carman-Ainsworth you went until the eleventh
12       grade?
13  A.   I went until the tenth grade, and then I moved to
14       Toledo, Ohio for about a year, a year and a half, and I
15       went to Woodward High School there, and then I came
16       back here. And I got kind of didn't go to school for a
17       while, and then right prior to my dad passing away I
18       got back into a program at Mott. And after he passed
19       away I -- well, actually, when I found out he was in
20       Sanilac County Jail, I stopped going. The day that I
21       found out, I was in school. And the circumstances of
22       him being arrested were too hard for me to kind of
23       handle emotionally, so I stopped going to school.
24  Q.   Okay. Now, I have the date of your father's arrest up
25       in Sanilac County as November 19th, 2017.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

Page 9

1  A.  Correct. Which was a Sunday, and I didn't find out
2      until Monday.
3  Q.  So then on November 20th, that would be the day you
4      dropped out?
5  A.  Uh-huh.
6  Q.  Yes?
7  A.  Yes. Sorry.
8  Q.  That's all right. And so did you officially drop out
9      or you just stopped going?
10 A.  I just stopped going.
11 Q.  Gotcha. Okay. And at that time how old were you?
12 A.  I was 21.
13 Q.  Okay. And when did you first start in the GED program
14     at Mott?
15 A.  I was only going there for probably about two weeks
16     before that.
17 Q.  So sometime in early November?
18 A.  Yes.
19 Q.  Of 2017?
20 A.  Yes, I believe so.
21 Q.  All right. So you dropped out on the 20th of
22     November 2017?
23 A.  Yes.
24 Q.  And did you say you've started again?
25 A.  Yes. I just recently started. One day last week I

Page 10

1      went and enrolled. Actually, it was Thursday of last
2      week. I went and enrolled at Atherton Alternative Ed
3      off of Center Road across from Meijers.
4  Q.  Okay. And when do you start?
5  A.  I already started. I started that day.
6  Q.  Oh, okay.
7  A.  And it's online, and it's kind of like at your own
8      pace. They recommended that because my testing scores
9      were so high that I just go for my GED, because then I
10     will only have to do 40 hours and I can get it a lot
11     faster than trying to do my high school diploma. But I
12     just thought like if I got my high school diploma that
13     it would make my dad proud, so.
14 Q.  Sure. So are you employed?
15 A.  No.
16 Q.  Okay. When were you last employed?
17 A.  Honestly, it's been a while. I'm seeking disability
18     right now, because I have epilepsy amongst a lot of
19     other -- I've struggled with depression my whole life
20     and anxiety and bipolar, so it makes it really hard for
21     me to communicate the way I need to.
22 Q.  Okay. When were you last employed?
23 A.  It's been -- I can't really give a definite answer for
24     that.
25 Q.  Have you worked since your father passed away?

Page 11

1  A.  Yes.
2  Q.  Okay. So maybe earlier this year you worked?
3  A.  Yes. I worked -- I want to say I stopped working about
4      three -- no, it was about four months before I had my
5      daughter. And I had her in March, so it was probably
6      like the end of December I stopped working. I was
7      working at a factory for like a month, and that was
8      only because I had no options. I had to come up with
9      something for my children.
10 Q.  Sure. In 2017 were you employed?
11 A.  Yeah. I had a couple of jobs. I worked at Meijers for
12     like two weeks. I worked as a home health aide for
13     Mercy Plus for about two months.
14 Q.  Sure.
15 A.  And it was just little three-hour visits at people's
16     houses helping them out. Nothing that was like
17     longterm or anything like that.
18 Q.  Sure. Like in November of 2017, I think you indicated
19     you were at Mott working towards your GED. Were you
20     working at that time?
21 A.  No, I was not.
22 Q.  Were you working right before you started at Mott?
23 A.  No, I was not.
24 Q.  Okay. Any other jobs you've had since 2017?
25 A.  Little side jobs. I did -- I was a collections caller

Page 12

1      for a -- for urgent care. Like you called urgent care,
2      somebody's patient. I was a collections caller for
3      that. That was okay for me to do because I was at a
4      desk and on a phone with people that I wasn't seeing
5      face to face. No. Other than that, no.
6  Q.  Any other education that you've had other than what
7      you've already said?
8  A.  No.
9  Q.  Trade schools, go to college, anything like that?
10 A.  No.
11 Q.  Other than the time I think you said you went to
12     Toledo, have you lived in Flint your whole life other
13     than that?
14 A.  Yes.
15 Q.  Okay. And how long were you in Toledo?
16 A.  I was there for a year to a year and a half.
17 Q.  Now, do you have any criminal convictions yourself?
18 A.  I myself have -- I've had one.
19 Q.  Okay.
20 A.  It's like not recognizable, because I completed drug
21     court. I took a charge for my ex-boyfriend. It was a
22     cocaine charge.
23 Q.  Okay. Was it delivering cocaine?
24 A.  Possession with intent to deliver 50 grams or less.
25     And I got HYTA, and I completed drug court for it.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

Page 13

1  Q. Okay. And was that prior to 2017?
2  A. Actually, I graduated drug court on November 6th, 2017.
3  Q. And you say you took that charge for your boyfriend?
4  A. Yes. Who is now in jail for murder, so.
5  Q. Oh, okay. And what was his name?
6  A. His name is Ojwjuan King. He wasn't involved with my
7     dad at all.
8  Q. Okay. Did you serve any jail time for that?
9  A. Yeah. I was in jail for approximately three months. I
10    got out around I want to say January 30ish, and I
11    started therapy at Catholic Charities and going to drug
12    court regularly.
13 Q. So January 30th, 2017?
14 A. No. No. This charge goes back to 2015. I got it in
15    like October, I believe, of 2015. And then I was in
16    jail from October until January. And then I was in
17    drug court from then on until November 6th of 2017.
18 Q. Okay. And drug court, I assume you have to test
19    negative and go through drug testing and you passed
20    that okay?
21 A. Yes. I passed it okay.
22 Q. Are you addicted to any drugs?
23 A. I wouldn't say addicted.
24 Q. Do you have addiction issues?
25         MR. WILENSKY: Objection, relevance.

Page 14

1  BY MR. SHOUDY:
2  Q. You can go ahead and answer. It's just a discovery
3     dep.
4  A. I've smoked marijuana for my epilepsy, so CBD to help
5     me with my seizures.
6  Q. Cocaine, heroin, anything like that?
7  A. No. I don't do anything like that.
8  Q. All right. So what is the name of your mother?
9  A. My mom's name is Tami, T-a-m-i.
10 Q. And is it still Shimmel, or is it a different last
11    name?
12 A. It was never Shimmel. Her last name is Husak,
13    H-u-s-a-k. That's her married name.
14 Q. And what was her name when you were born?
15 A. Robbins, R-o-b-b-i-n-s.
16 Q. Okay. So your mother and your father were never
17    married?
18 A. Correct.
19 Q. Was your father ever married?
20 A. No.
21 Q. And do you have any siblings?
22 A. Yes. I have an older brother that has the same mom and
23    dad, and I have a younger brother that has a different
24    dad.
25 Q. All right. So the older brother would be your father's

Page 15

1     son as well?
2  A. Correct.
3  Q. And same mother as well?
4  A. Yes.
5  Q. And what's your older brother's name?
6  A. Andrew Steven Shimmel.
7  Q. And how old is Andrew?
8  A. Andrew is -- he was born December 21st, '93.
9  Q. Twenty-five?
10 A. Yeah.
11 Q. And is he local?
12 A. No, he's not. He's in the Navy. Right now he's in
13    North Carolina, I believe.
14 Q. In November of 2017, was he in the Navy in North
15    Carolina as well at that time?
16 A. I'm not -- I kind of want to say he was deployed, but
17    I'm not 100 percent sure. I know that we had to go
18    through Red Cross to get him notified because he was
19    out on a ship. And they had to go through like the
20    airwaves to notify him and stuff like that.
21 Q. You're talking about when your father died?
22 A. Yes. So I'm not 100 percent positive on that.
23 Q. So is your father's mother and father still alive?
24 A. No, they're not. They're both deceased.
25 Q. And were they deceased prior to 2017?

Page 16

1  A. Yes.
2  Q. Does your father have any siblings?
3  A. Yes.
4  Q. Quite a few, right?
5  A. Yes, quite a few.
6  Q. Like ten maybe, something like that?
7  A. Mary, Tom, Bob -- he has -- he had a lot. Some of them
8     are deceased. So, I mean, the ones that are alive,
9     there's a few left.
10 Q. Okay. Which ones are deceased?
11 A. My Uncle Arnold is deceased, my Aunt Celia, my Uncle
12    Tom, and my Uncle -- what is his name? See, I didn't
13    have the best relationship with all my uncles and
14    aunts. Like, I didn't see them all the time. My Uncle
15    John is deceased as well.
16 Q. And those would all be your father's brothers and one
17    sister, Celia?
18 A. Correct.
19 Q. Did any of them die from suicide or any mental health
20    issues?
21 A. I'm not 100 percent sure. I've heard stories about my
22    Aunt Celia's death being a possible suicide, but I'm
23    not 100 percent sure.
24 Q. Okay. What aunts or uncles of yours was your father
25    closest with?

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SHIMMEL, MICHELLE RENEE
04/25/2019
Pages 17–20

Page 17

| | | |
|---|---|---|
| 1 | A. | My Aunt Ruth and my Uncle Bob. |
| 2 | Q. | Aunt Ruth? |
| 3 | A. | Yes. |
| 4 | Q. | I wasn't sure if you said Ruth or Rutha. |
| 5 | A. | Ruth. |
| 6 | Q. | Ruth, okay. And Aunt Ruth would be a Shimmel as well? |
| 7 | A. | Her last name is Buning, B-u-n-i-n-g. She's married. |
| 8 | Q. | And then Bob is Robert Shimmel? |
| 9 | A. | Correct. |
| 10 | Q. | Okay. Did your father have addiction issues? |
| 11 | A. | Yes. |
| 12 | Q. | And do you know what drugs he was addicted to? |
| 13 | A. | Pretty much everything, heroin, crack cocaine. He wasn't -- he didn't like marijuana as far as himself doing it. He -- alcohol occasionally. If my dad drank alcohol, I knew that everything else was going to follow. I'm not really too sure if there was pills or anything else, but that's what I know of. |
| 19 | Q. | Sure. And do you know how long he was addicted to heroin? |
| 21 | A. | On and off, my whole life. I'm not sure if it was before I was born as well, but I know on and off my whole life. |
| 24 | Q. | Sure. Same thing with crack cocaine? |
| 25 | A. | Correct. |

Page 18

| | | |
|---|---|---|
| 1 | Q. | Same thing, on and off your whole life? |
| 2 | A. | Yes. |
| 3 | Q. | Okay. Do you recall any type of treatment he was receiving for addiction issues, heroin or crack cocaine? |
| 6 | A. | Prior to him passing, he hadn't had too much treatment since 2016. |
| 8 | Q. | And what treatment did he have in 2016? |
| 9 | A. | He went to Salvation Army I believe it was at that time for like a 90 day program. It was either Salvation Army or Sacred Heart at that time. |
| 12 | Q. | Is that inpatient? |
| 13 | A. | Yes. He was away. |
| 14 | Q. | And do you know which Sacred Heart facility? |
| 15 | A. | I'm not 100 percent sure. Like I said, I don't even remember if it was Sacred Heart or Salvation Army. |
| 17 | Q. | Sure. |
| 18 | A. | So I just know that he was away from home. I was living with him at that time. |
| 20 | Q. | Any other treatment that you recall him receiving or participating in? |
| 22 | A. | I mean, he used to go to CMH. And I know he was trying to get Suboxone to help him with his addiction, weaning him off and stuff. So I'm sure that there's times prior to him passing that that could be in the record. |

Page 19

| | | |
|---|---|---|
| 1 | | Other than that, I'm not really certain. |
| 2 | Q. | Okay. Do you know when he had last gone to CMH? |
| 3 | A. | No. |
| 4 | Q. | Was he going to CMH in 2017, or you don't remember? |
| 5 | A. | I don't remember. And if it was, it would have been the beginning of 2017. |
| 7 | Q. | Okay. Now, had there been any history of suicide attempts by your father? |
| 9 | A. | Not that I'm aware of at all. |
| 10 | Q. | Okay. |
| 11 | A. | My dad disclosed multiple times that he wanted to live to be there for his grandchildren and me, so. |
| 13 | Q. | Now, in November of 2017 you had one at home at that time, right? |
| 15 | A. | Yes. And I was pregnant. |
| 16 | Q. | And you were pregnant with the second one? |
| 17 | A. | Yes. |
| 18 | Q. | And what would be your oldest would be his grandchild? |
| 19 | A. | Yes. |
| 20 | Q. | Would that be his first grandchild? |
| 21 | A. | Yes. |
| 22 | Q. | Okay. I assume he was fairly close with the grandchild? |
| 24 | A. | Yes. |
| 25 | Q. | Sure. Now, was there a time shortly before he was |

Page 20

| | | |
|---|---|---|
| 1 | | arrested where he overdosed? |
| 2 | A. | Yes, Saturday. |
| 3 | Q. | Would you tell me about that. |
| 4 | A. | The Saturday before everything happened for whatever reason that he was arrested, he was over at his girlfriend's house at the time. She kind of had an abandoned house. So they were in the driveway in a car, and he was in the driver's seat, she was in the passenger's seat. And she called me, and she's like, your dad's overdosing. I don't know what to do. Your dad's overdosing. And I was all the way on the south side of Flint. This was on the east side of Flint where he was located at. |
| 14 | | And I had my friend -- because I can't drive, I had my friend drive me over there as fast as we could get over there. And she was like smacking him and trying to get him to come out of it. And I'm like, you know, you can't do that. You don't have -- if you don't have any Narcan, you know, you need to pour water on his neck, you need to do something. I mean, because I've been around my dad so long that I know what he had to do when other people have overdosed. |
| 23 | | So I found some bottles of water. Obviously, at that time it was still a little chilly out, so the water was cold enough, and when I poured it on him he |

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

Page 21

kind of came to. And I asked Michelle, I'm like, well, my dad's not going to be okay to drive in this car. You know what I mean? You guys need to switch. So I had my dad move to the passenger's side, because I didn't want my dad to try driving after he just, you know, overdosed. And I ended up making sure that he could walk. And I was pretty upset at him, so I ended up leaving. After I made sure he was going to be okay, I left.

Q. Okay. So when he overdosed he was in a car?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. Did he own the car, or was it somebody else's car?
A. No, he did not own the car.
Q. Whose car was it?
A. I'm not 100 percent certain.
Q. And you said he was with a girlfriend?
A. Yes.
Q. And what was his girlfriend's name?
A. Michelle Thompson.
Q. And you said she was at an abandoned house?
A. Yeah. At that point in time, she claimed that she owned the house. But the house was like no type of living conditions at all. It didn't have heat, water,

Page 22

electric, no piping. So they were inside the car when everything occurred.
Q. Okay. So was she then using as well?
A. Yes.
Q. Okay. So your father and her were using --
A. Together.
Q. -- together?
A. Correct.
Q. And he had too much?
A. Uh-huh.
   MR. WILENSKY: Is that a yes? I'm sorry.
   THE WITNESS: Yes.
BY MR. SHOUDY:
Q. He had an overdose?
A. Yes.
Q. Did anyone say that that was an attempt to take his life or anything like that?
A. No.
Q. Okay.
A. No. Because after the fact, I was told that Michelle was the one who shot him up that time, so therefore I wouldn't say that at all.
Q. Sure. Had your father overdosed in the past?
A. He has. He had overdosed in 2016 before he went to rehab. We were living together. I was pregnant with

Page 23

my daughter. And he was doing really great. This is the greatest my dad has ever done. You know, he had his own business, and things were really going good. You know, he had been clean for a while, and I was so proud of him. I moved in with him. He was paying the rent. This was the first time that I've ever seen my dad so strong on his feet. And then he got around somebody who he ended up getting high with, and he had overdosed. And while he was in a bathtub full of ice, they stole his credit card and went to Meijers and basically took everything that he had off his credit card. And that was kind of like the downward spiral point.
Q. Was that 2017?
A. 2016 is when that happened.
Q. So for 2017 he was using for pretty much the whole year?
A. Yeah, pretty much.
Q. Now, have you seen any of the documents pertaining to your father's arrest in November of 2017 or any of the charges that were raised against him?
A. I spoke with an officer over the phone, and they had told me some of the charges.
Q. Right.
A. I think it was pretty much all of the charges,

Page 24

actually, at that point. And my uncle had some documents. And at the time that I seen the documents that he had, the stuff was blacked out, the important stuff was blacked out in my opinion.
Q. Okay.
A. I haven't seen anything other than that, so.
Q. Were you familiar with any of the people that, you know, he -- I mean, you're aware that he went to Ubly, Michigan with several other individuals and he was accused of trying to basically, you know, rob a marijuana grow operation?
A. Yes. I heard of that.
Q. Sure. Okay. And you know one of the individuals who was with him was shot and killed at the residence, and then there was a second person who died who had left the scene with your father and then died just down the road?
A. Yes. I heard of that as well.
Q. Okay. And then there was also another individual who was arrested at the same time your father was, and then he was -- he's still in jail, and I think he was just sentenced late last year.
A. Okay. I didn't know that he was sentenced already. But, yes, I was aware of him.
Q. All right. And so are you familiar with any of those

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SHIMMEL, MICHELLE RENEE
04/25/2019

Pages 25–28

Page 25

1     individuals if I gave you their names?
2 A. No, I'm not. And I don't know their names. I have
3     seen one of them, and it was one of the ones that is
4     deceased.
5 Q. Okay.
6 A. I've seen him once. It was -- he was kind of a lighter
7     skinned -- lighter skinned guy, more mixed I guess you
8     could say, mulatto in color.
9 Q. All right. There was a Quantize Bruce who was shot at
10    the location.
11 A. Uh-huh. I think that's the one I'm talking about.
12 Q. Okay. And then there was a Keith Saunders who ended up
13    dying shortly thereafter, that had been hit and was in
14    the car that your father was in.
15 A. Okay.
16 Q. Do you know him?
17 A. No.
18 Q. And then Preston Jack was the one who was arrested and
19    is in jail right now.
20 A. Right. I don't know him either.
21 Q. Okay. And do you know in November of 2017, had your
22    father moved out and was no longer living with you, or
23    was he living with you?
24 A. We weren't living together at that time. He was living
25    with Michelle riding around in that car. So I'm not

Page 26

1     sure where he was.
2 Q. What color was the car?
3 A. It was like a silver-ish blue-ish color I want to say.
4     I can't really remember the car like that.
5 Q. Yeah. Some people are good at the car makes and
6     models.
7 A. Right.
8 Q. Do you know what those were?
9 A. No. I'm not good at that.
10 Q. I'm not one of those either.
11 A. Right.
12 Q. Okay. Now, had your father been in jail before he was
13    in the Sanilac Jail?
14 A. My dad's been in and out of jail my whole life. He
15    used to tell me that jail was his second home, because
16    he knew that when he went to jail he would be safe and
17    he would have food, and he didn't always have that out
18    here.
19 Q. Sure. Now, had you spoken with him when he was in jail
20    prior to the time he was in the Sanilac County Jail?
21    So before his arrest, had there been other times where
22    you would -- you know, you were able to communicate
23    with him in jail whether by video or phone?
24 A. You're talking about -- so not the Sanilac County
25    incident?

Page 27

1 Q. Correct.
2 A. But before that when he was in jail?
3 Q. Yes.
4 A. Yes. I always communicated with my father while he was
5     in jail.
6 Q. Okay. So that's something you've done basically all
7     your life?
8 A. Yes.
9 Q. Okay. And then I think you indicated in November of
10    '17 you had a boyfriend who was also in jail at that
11    time?
12 A. My boyfriend -- I've been with the one that I'm with
13    right now since my daughter was two months old. So the
14    Ojwjuan King guy I haven't had anything to do with
15    since October of 2015.
16 Q. Okay. Is he the father of your youngest?
17 A. No, he's not.
18 Q. Okay.
19     MR. WILENSKY: She said that the current
20    boyfriend is the father of her two youngest children.
21 BY MR. SHOUDY:
22 Q. The two youngest. And then the oldest?
23 A. The oldest one --
24 Q. That's a daughter, right?
25 A. Yeah, it's a daughter. They're all three girls.

Page 28

1 Q. Oh, wow. Good luck.
2 A. I'm not really going to pursue that any further, that
3     conversation.
4 Q. Okay. Fair enough. Yeah. I don't need to know.
5     So have you listened -- I gave your lawyer
6     some audio tapes. Have you had a chance to listen to
7     those?
8 A. No.
9 Q. Okay. Let me see if I can play these for you. So am I
10    correct that you've called in to the Sanilac County
11    Jail when your father was in in November of 2017?
12 A. Yes.
13 Q. And I have you calling in on two occasions. Is that
14    correct?
15 A. Yes. There was more than that. I have call logs in my
16    phone. But, yes, those are the two pertinent ones.
17 Q. Do you still have those call logs?
18 A. Actually -- well, I turned my phone off, but I believe
19    I have them saved in my photos.
20 Q. Okay. Is that something I can see?
21 A. Yes. November 2017, okay.
22 Q. All right.
23 A. This is the Sanilac County Jail right here. I called
24    on November 22nd at 9:07 a.m. I called on
25    November 21st at 4:36 p.m. I called on November 21st

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

Page 29

1    at 10:51 a.m. I called on November 20th at 5:01 p.m.
2    I called on November 20th at 1:38 p.m. I called on
3    November 20th at 1:37 p.m.
4  Q. Okay.
5         MR. WILENSKY: Could she take a picture --
6  BY MR. SHOUDY:
7  Q. Oh, is this a picture here I'm looking at?
8  A. Yes.
9  Q. Okay. Could you just for the record read in the length
10    of each of those calls.
11 A. Yes.
12 Q. Okay.
13 A. November 22nd at 9:07 a.m., there was an outgoing call
14    for five minutes and zero seconds. On November 21st at
15    4:36 p.m., there was an outgoing call for four minutes
16    and 48 seconds. On November 21st at 10:51 a.m., it was
17    an outgoing call for one minute and nine seconds. On
18    November 20th at 5:01 p.m., it was an outgoing call for
19    56 seconds. On November 20th at 1:38 p.m., it was an
20    outgoing call for one minute and 27 seconds. And then
21    November 20th I probably just hung up the phone at 1:37
22    p.m., because it was only eight seconds long.
23 Q. Okay. I'm sorry, what was the length of the call on
24    the 21st at 4:48?
25 A. At 4:36?

Page 30

1  Q. At 4:36, I'm sorry.
2  A. It was four minutes and 48 seconds.
3  Q. I can't read my own handwriting. And then November
4    22nd was at what time?
5  A. 9:07 a.m.
6  Q. And how long was that one?
7  A. Five minutes.
8  Q. Okay. Now, earlier you had indicated that the two
9    calls that I reference that there was audio recordings
10    for, you said those were the pertinent ones. What did
11    you mean by pertinent?
12 A. I'm hoping they were the longer ones where they would
13    have more information in them.
14 Q. Okay. All right. So let me --
15 A. Sorry about my screen.
16 Q. Yeah. Let me explain. I'm going to have -- once
17    you've confirmed this is you on the phone, then I'm
18    going to ask the court reporter to make a transcript of
19    the audio.
20 A. Of the conversation?
21 Q. Yeah. Just the whole legal system doesn't work well
22    with audio, so it's better to have a transcript.
23 A. Okay.
24 Q. I'm going to do them in order. So there was -- I'm
25    going to start with the November 21st. Okay. So what

Page 31

1    I'd like to do is then do a transcript. So the person
2    you spoke with there I believe was Deputy Adamczyk, is
3    that correct?
4  A. Yes. I know it was a female. I didn't remember the
5    name.
6  Q. She identified herself as Deputy Adamczyk, right?
7  A. Right.
8  Q. Okay. And then the two people speaking are you and the
9    deputy.
10 A. Okay.
11 Q. I think it should be easy to follow along, because I've
12    listened to it myself. I'm sure your lawyer has as
13    well.
14 A. Okay.
15         MR. SHOUDY: Let me play this.
16         DEPUTY ADAMCZYK: This is Deputy Adamczyk.
17         MICHELLE SHIMMEL: Hi. My name is Michelle
18 Shimmel. I was calling to see if my dad's been
19 arraigned yet.
20         DEPUTY ADAMCZYK: No, he has not. I'm not
21 sure what time they are doing that. But he hasn't been
22 arraigned yet.
23         MICHELLE SHIMMEL: Okay. Yeah. I have
24 another question. Is there any -- do you guys do like
25 online visitation?

Page 32

1         DEPUTY ADAMCZYK: Yeah, but once they get
2  into general population. He's still downstairs in
3  holding.
4         MICHELLE SHIMMEL: Okay.
5         DEPUTY ADAMCZYK: It won't be until after
6  he's arraigned before we will know something, okay?
7         MICHELLE SHIMMEL: Okay. Thank you. I'll
8  call -- I'll keep calling.
9         DEPUTY ADAMCZYK: If you want to call after
10 5:00, we should know something by then, okay?
11         MICHELLE SHIMMEL: Okay. Sounds great.
12 Thank you so much.
13         DEPUTY ADAMCZYK: You're welcome. Bye bye.
14         MICHELLE SHIMMEL: Bye.
15 BY MR. SHOUDY:
16 Q. Okay. And so I guess my question is: Is that the
17    phone call you had?
18 A. Yes. That was Tuesday, I believe.
19 Q. Okay. That's Tuesday the 21st?
20 A. Uh-huh.
21 Q. Yes?
22 A. Yes.
23 Q. Okay. And you know your dad was arraigned around 3:00,
24    3:30 that day?
25 A. No, I did not know --

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SHIMMEL, MICHELLE RENEE
04/25/2019
Pages 33–36

Page 33

1  Q.  Okay.
2  A.  -- exactly what time it was or anything like that.
3  Q.  Obviously, because you didn't go to the arraignment?
4  A.  Right.
5  Q.  You had a young one at home?
6  A.  Yeah.
7  Q.  Okay. Let me go to the next one. All right. So this
8      one is going to be the one we have a time stamp of
9      4:37 p.m.
10 A.  Okay.
11 Q.  Which corresponds with your cell phone time, right?
12 A.  Okay. Well, it was 4:36, but yes.
13 Q.  Okay. Maybe there's a half minute or minute or maybe
14     it doesn't kick in until you actually get through to
15     them.
16 A.  Right.
17 Q.  All right. So I'm going to go ahead and play this one
18     through, and I'll just ask you the same question, if
19     this was the conversation you had, okay?
20 A.  Okay.
21        DEPUTY ADAMCZYK: Sanilac County Jail, Deputy
22 Adamczyk.
23        MICHELLE SHIMMEL: Hi. I was calling to see
24 if Steven Shimmel was arraigned.
25        DEPUTY ADAMCZYK: Yes, he has been.

Page 34

1        MICHELLE SHIMMEL: He has been? How do I
2  find out more information?
3        DEPUTY ADAMCZYK: As of right now, he has no
4  bond and -- let's see. Give me a second here. I've
5  got to -- he has no bond. And I think the 27th --
6  okay. There's no bond. He has court again on
7  November 28th for a probable cause hearing, which is to
8  determine whether or not they think that there's a
9  chance that -- or whether they believe that he's
10 responsible for any of these charges or possibly could
11 have something to do with them and determine whether or
12 not they need to go further or not.
13       MICHELLE SHIMMEL: Okay.
14       DEPUTY ADAMCZYK: He was charged with eleven
15 felony counts. It was assault with intent to murder,
16 two of those, conspiracy to commit assault with intent
17 to murder, robbery armed serious injury, assault with
18 intent to rob while armed, assault with intent to rob
19 while armed, conspiracy to commit robbery armed, home
20 invasion first degree, weapons firearms possession by
21 felon, stolen property receiving and concealing, and a
22 weapons felony firearm. And that is all I have.
23       MICHELLE SHIMMEL: Felony firearm.
24       DEPUTY ADAMCZYK: Okay?
25       MICHELLE SHIMMEL: All right.

Page 35

1        My dad overdosed on Saturday.
2        DEPUTY ADAMCZYK: I can't hear you, ma'am.
3        MICHELLE SHIMMEL: I said my dad overdosed on
4  Saturday.
5        DEPUTY ADAMCZYK: Who's your dad?
6        MICHELLE SHIMMEL: Steven Shimmel.
7        DEPUTY ADAMCZYK: Okay.
8        MICHELLE SHIMMEL: And I had to bring him
9  back to life.
10       DEPUTY ADAMCZYK: Okay.
11       MICHELLE SHIMMEL: So I know that he was
12 probably very angry. He had no Narcan or nothing, and
13 he was dead for at least five minutes.
14       DEPUTY ADAMCZYK: Okay.
15       MICHELLE SHIMMEL: So I just -- like -- do
16 you know how to set up the phone calls and all that?
17 Because he's been trying to call me all day pretty
18 much.
19       DEPUTY ADAMCZYK: Okay. I can give you our
20 information as far as -- they have a video visitation
21 thing they might be able to help you with.
22       MICHELLE SHIMMEL: Is it kind of similar to
23 where you go online to like Securus or something like
24 that?
25       DEPUTY ADAMCZYK: Yes. We have

Page 36

1  securustext.net.
2        MICHELLE SHIMMEL: Okay.
3        DEPUTY ADAMCZYK: Okay?
4        MICHELLE SHIMMEL: All right. Thank you.
5        DEPUTY ADAMCZYK: You're welcome. Did you
6  need the website for depositing money if you were
7  planning on doing that at all?
8        MICHELLE SHIMMEL: Yeah.
9        DEPUTY ADAMCZYK: Okay. It's
10 smartsdeposit.com.
11       MICHELLE SHIMMEL: Okay. You said smart?
12       DEPUTY ADAMCZYK: Smartdeposit.com.
13       MICHELLE SHIMMEL: Okay.
14       DEPUTY ADAMCZYK: Okay?
15       MICHELLE SHIMMEL: Thank you so much.
16       DEPUTY ADAMCZYK: You're welcome. Did you
17 want his jacket number, because you're going to need
18 that when you go to put money in if you do?
19       MICHELLE SHIMMEL: Yeah.
20       DEPUTY ADAMCZYK: Okay. His jacket number is
21 281255A.
22       MICHELLE SHIMMEL: All right. Thank you.
23       DEPUTY ADAMCZYK: You're welcome. Have a
24 good day.
25       MICHELLE SHIMMEL: You too.

Page 37

BY MR. SHOUDY:
Q. Okay. That's the phone conversation you had on the second call on the 21st?
A. Yes.
Q. Okay.
A. Second call.
Q. And so the first call on the 21st was before he was arraigned?
A. Correct.
Q. And then the second call was after he was arraigned?
A. Correct.
Q. Okay. And then your phone also reflects that he placed three calls on the 20th. And I think you said the first one was only eight seconds, so that was probably a hang-up?
A. Right.
Q. And then you called at 1:38, and that call lasted a minute and 27 seconds?
A. Correct.
Q. What do you remember about that call?
A. Honestly, I can't say that I remember exactly what was said between these two calls at all.
Q. Okay.
A. I thought that I had mentioned to them that I wanted somebody to tell him that I loved him because I

Page 38

couldn't answer my phone at some point in there and then to keep an eye on him because of the fact that he had overdosed and I was concerned for his safety with his mental wellbeing and everything.
Q. Okay. And you were concerned since he had overdosed before he might --
A. He might have some bad thoughts. You know what I mean? I know what it feels like to be in jail. I mean, come on, whoever goes to jail -- especially for things that I know that my dad wasn't accountable for. He may have been accountable for one of those charges, but not eleven of them. And I feel like he felt like he had no way out, and he couldn't get ahold of anybody and maybe even that nobody in there was listening to how he felt about it, and that that could have been his only option.
Q. So let me ask it this way: Did you ever touch base with your dad after he was arrested?
A. No.
Q. I think it's mentioned in one of the recorded telephone calls that he had tried to call you?
A. Yes, multiple times.
Q. And I think you indicated that day, which would have been the 21st?
A. Yes.

Page 39

Q. Was it only the 21st you had received --
A. No.
Q. Okay.
A. I think I have that in here too as well.
Q. Okay.
A. Let me doublecheck though. Because that was a different number. It was like the jail number. I'm not seeing it now. I've went through so many phones since then. Okay. Actually, here it is right here. He did call me. It may have only been the 21st.
Q. Okay.
A. Or I just may not have the other times. But the 21st he had called me four times.
Q. Okay. And could you give us the times of those calls?
A. November 21st at 9:56 a.m., November 21st at 9:58 a.m. -- oh, wait. No. That's me trying to call that number back.
Q. Okay.
A. Okay. So it was November 21st at 9:56 a.m., and I stayed on the phone for a minute and 29 seconds even though I couldn't pay for it.
Q. You're talking about your call back to him?
A. No. He called me on November 21st at 9:56 a.m. It says that we were on the phone together for a minute and 29 seconds.

Page 40

Q. Did he get ahold of you at that time?
A. No. I didn't have any money to put on the card. I was trying to figure out how much they would charge me, and then I heard it was like 14.99 or whatever.
Q. So that's a call, and then when you're receiving it you have to pay for it?
A. Put money down, correct.
Q. So you're talking basically to a computer or the operator?
A. Yes. I was just listening to what they say or whatever. November 21st at 10:09 a.m., he called me again. And then I missed his call on November 21st at 11:31 a.m.
Q. And the 11:31 a.m. you didn't answer, but the 9:56 a.m. and the 10:09 a.m. --
A. They were both a minute -- well, the first one was a minute and 29 seconds. The second one was a minute and zero seconds. I just wanted to hear him say his name again, because I couldn't talk to him.
Q. Okay. So the 11:31 a.m. call was he had called and you missed the call?
A. Correct.
Q. But the earlier two calls you answered, but you didn't have the money to complete the connection?
A. Correct.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

Page 41

1  Q.  Okay.
2  A.  I'm trying to see if there are anymore in here.
3  Q.  Were there any calls on the 20th?
4  A.  I'm not seeing my records from that day at all from him
5      calling in.
6  Q.  Okay. And that would be consistent with the voice mail
7      where you said he had called you that day?
8  A.  Right. Right.
9  Q.  All right. On the calls that you placed on the
10     20th that we went through, and there's actually two
11     that were not hang-ups, those two calls, one was a
12     minute 27 seconds and the other was 56 seconds?
13 A.  Right.
14 Q.  Do you know who you spoke with?
15 A.  I can't even remember what you said her name was. I
16     know it was a female. That's all I can remember.
17 Q.  Can you testify as to anything that was said more than
18     what we've had recordings for?
19 A.  No.
20 Q.  Okay. That's because you don't remember?
21 A.  Right.
22 Q.  But what you were trying to do, I assume, is call and
23     find a way to return your dad's calls?
24 A.  Correct.
25 Q.  Or connect with your dad because you knew he was there,

Page 42

1      correct?
2  A.  Yes.
3  Q.  Actually, on the 20th, you weren't returning his call,
4      you were trying to reach him?
5  A.  Yes.
6  Q.  Okay. And so that was the purpose of the calls on the
7      20th, and that was also the purpose of the calls on the
8      21st?
9  A.  Right. Because when I first called at 1:30, I was in
10     school. And I had received a call from one of my dad's
11     friends who had informed me that my dad may potentially
12     be in jail at that time.
13 Q.  Okay.
14 A.  And so I called -- I left school. I went out to my car
15     at the time, and I called the Genesee County Jail.
16     They said they had nobody at that time, you know, by
17     his name there or whatever. So then I called the
18     person back who had informed me, and they said, well,
19     maybe you need to try a different jail. And I'm like,
20     well, what different jail would he be in? You know
21     what I mean? Because my dad doesn't really go outside
22     of Flint like that. And so they were like, well, I was
23     told that he might be on his way back from Sanilac
24     County. And I'm like Sanilac County, where is Sanilac
25     County at? So then I looked up the number, and I ended

Page 43

1      up finding it and calling, and that's how I found out
2      he was there.
3  Q.  Okay. And I think there was like a newspaper article
4      published?
5  A.  Uh-huh.
6  Q.  That I did notice on Facebook you had flagged and
7      attached to your Facebook account.
8  A.  Okay.
9  Q.  Does that ring a bell?
10 A.  Yes. There's a couple of those articles there.
11 Q.  And I think you posted, hey, that's actually my dad?
12 A.  Yes.
13 Q.  Okay. So somebody told you that he was actually
14     arrested up in Sanilac County?
15 A.  Right.
16 Q.  Okay. Then there was also a call on your cell phone
17     you referenced on November 22nd at 9:07?
18 A.  Yes.
19 Q.  And that was like a five-minute call?
20 A.  Yes.
21 Q.  Tell me what you remember about that call.
22 A.  That was a phone call with Sheriff Biniecki.
23 Q.  Okay.
24 A.  I remember talking to him about it. Because I believe
25     my aunt called me at 6:00 in the morning telling me

Page 44

1      that Sanilac County Police had showed up to her door at
2      3:00 a.m. to inform her of my dad.
3  Q.  When you say your aunt, this is your Aunt Ruth?
4  A.  My Aunt Ruth, correct. And my phone was on silent. I
5      didn't even see that she called until then. And then I
6      didn't want to call her back at 6:00 in the morning,
7      because I didn't know if she was sleeping or not. So I
8      think I waited until right before I talked to Sheriff
9      Biniecki to return my aunt's phone call, and that's
10     when she told me that my dad had passed away. And I
11     was over at my mom's house when I found out.
12         And I talked to Sheriff Biniecki for a minute
13     and found out, you know, like, you know, he committed
14     suicide. And I'm like -- I was kind of like in shock.
15     You know what I mean? Because I never would expect
16     something like that from my dad, especially in jail.
17     Because like I had mentioned before, he said that was
18     his safe -- his second home and he was -- he felt more
19     safe there always.
20         And I was just in shock. At that point I was
21     more concerned about my brother, because he wasn't
22     here. You know what I mean? And so Sheriff Biniecki
23     was willing to help us, help my brother get back here
24     and work with Red Cross Blue Shield, which was great.
25     But I just -- I just can't believe it all happened. I

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U.S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

Page 45

1   just -- I feel like there's a lot more that's left out
2   that I don't know, and I don't know if I'll ever know,
3   which is a major, major thing for me. Because, like,
4   I'm never going to be able to say goodbye, and I'm
5   never going to know everything that happened, and I
6   just don't feel like it's right.
7   Q. Ma'am, I'm sorry for your loss. I know it's very hard.
8       So the five-minute call with Sheriff Biniecki
9   was about -- I'm sorry, what was it about?
10  A. It was him informing me himself that he was sorry for
11  the loss of my father, asking me if there anything he
12  could do for me. He was willing to help us, you know,
13  work with Red Cross Blue Shield or whatever it's called
14  to get my brother back home, and that he was, you know,
15  working with the coroner and he didn't want to release
16  the information to the public yet. That was a major
17  thing for me. He said that he didn't want to release
18  the information to the public yet. He wanted to make
19  sure that everybody was informed. But they were kind
20  of like harassing him is basically what he was saying
21  to me. You know, he can't keep it down low for a long
22  time. He's going to end up having to release it to the
23  public.
24  Q. So the call --
25  A. To the media.

Page 46

1   Q. So had you called the sheriff, or had he called you?
2   A. That was me calling them.
3   Q. Okay. And it sounds like the sheriff was offering you
4   his condolences and trying to do what he could to help
5   you and at least keep it quiet until the family was
6   informed?
7   A. Yes.
8   Q. Okay. Did you talk to any other Sanilac County
9   deputies?
10  A. I can't remember exactly who I talked to for the first
11  two calls that happened on the 20th. I thought one of
12  them was a male and one of them was a female.
13  Q. Okay.
14  A. But I'm not 100 percent certain. Because I didn't even
15  remember all their names like that. I just remember
16  like the gist of the conversations of me wanting to let
17  them know about what happened prior to this tragic
18  event.
19  Q. Sure.
20  A. And to try to keep my dad safe. I mean, I may not have
21  said exactly what I needed to say at that point in
22  time, like, you know, keep your eyes on him directly,
23  but I did say, you know, my dad overdosed.
24  Q. Right.
25  A. Which should have been key words for somebody to

Page 47

1   realize that, you know, maybe I really do need to watch
2   this person.
3   Q. Okay. And I think you indicated that your father to
4   your knowledge had never been suicidal in the past?
5   A. He's never been suicidal to my knowledge. He had
6   struggled with depression and bipolar. More bipolar
7   than anything. Because he had a lot of anger problems
8   that go back to him being abused when he was a child.
9   Q. But you never told anyone that you thought he was
10  suicidal, because you didn't think he was suicidal?
11  A. Correct. I didn't think he was suicidal. I mean, I
12  was concerned as to how he would respond, because he's
13  never been charged with eleven felony counts or
14  possibly could be charged with eleven felony counts.
15  You know what I mean? And then him overdosing, and
16  then his history of mental health, I was concerned.
17  But I didn't think that, you know, he was going to
18  commit suicide.
19  Q. Right. There's a couple of other questions I wanted to
20  ask you. Are you familiar with an entity called Kith
21  Haven, K-i-t-h, Haven, H-a-v-e-n?
22  A. No.
23  Q. Is there a nursing home in Flint by that name?
24  A. Kith Haven?
25  Q. Okay. I'll go with that.

Page 48

1   A. I've heard of a nursing home named that, but I don't --
2   I'm not familiar with it at all.
3   Q. Is there any connection with your dad to that nursing
4   home? Did he stay there, go there, work there?
5   A. Huh-huh.
6   Q. No?
7   A. Not that I'm aware of at all.
8   Q. Okay. And are you familiar with Havenwyck?
9   A. Havenwyck?
10  Q. Yes.
11  A. Oh, that's a mental health hospital. I've been there
12  before.
13  Q. Okay. Where is that?
14  A. Honestly, I'm not sure. I've been to like four
15  different ones. All I know is that there's one of them
16  in Saginaw, one's in Pontiac, and there's a couple of
17  different ones.
18  Q. Sure. Okay. And do you know if your father has ever
19  been there?
20  A. He more than likely has.
21  Q. Okay.
22  A. I'm not 100 percent sure.
23  Q. Sure. Okay. And do you know, did your father have a
24  regular physician he was treating with?
25  A. Yes, he did.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U.S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

Page 49

1  Q.  Was that Dr. Roome?
2  A.  No. His doctor was Dr. Burtch, and he was located at
3      Hamilton Health Clinic on South Saginaw in Burton.
4  Q.  Okay. Any other physicians that you're aware of that
5      he was going to?
6  A.  No, I'm not sure.
7  Q.  Other than CMH, any other places other than what you've
8      already said that you believe he was receiving any type
9      of psychiatric treatment from?
10 A.  No.
11 Q.  I think I asked you this before. But you haven't seen
12     any of the documents in this case as to the jail
13     documents or anything like that?
14 A.  No. I've seen like one document pretty much that was
15     blocked out, like the things that were more important
16     to this case. His mental health history was blacked
17     out, things like that. And for the most part, that's
18     about it. Like, I didn't really see anything else like
19     that.
20 Q.  Did you watch any videos?
21 A.  No.
22 Q.  Okay. And you haven't talked to any of the deputies --
23 A.  No.
24 Q.  -- since you father's passed away?
25 A.  Correct, I have not. Except for Sheriff Biniecki right

Page 50

1      after.
2  Q.  That one call you already told me about?
3  A.  Yes. There was more than just that one call. I don't
4      know where all of them are, but I've talked -- I talked
5      to Sheriff Biniecki a little bit after, you know, my
6      dad passed, because he kind of just wanted to keep in
7      touch and help me. And he notified me when he released
8      it to the media and things like that.
9  Q.  Okay.
10 A.  It was just -- like not -- not like days after or
11     anything like that. It was just like that day, the day
12     after and then maybe even the next day.
13 Q.  Okay.
14 A.  But I'm not 100 percent sure on that.
15 Q.  The calls were all just relating to trying to help you?
16 A.  Yeah. And kind of give me a little bit of closure. It
17     didn't really help, but yeah.
18 Q.  Sure. Yeah. Understandable.
19         MR. SHOUDY: Okay. Ma'am, that's all I have.
20     Thank you very much.
21         MR. WILENSKY: I have one or two quick
22     questions.
23         THE WITNESS: Okay.
24                  EXAMINATION
25 BY MR. WILENSKY:

Page 51

1  Q.  Before your dad was arrested, he wasn't living with
2      you, correct?
3  A.  No, not at that time.
4  Q.  All right. How often would you see him?
5  A.  I was seeing him like every day.
6  Q.  Every day?
7  A.  Yes.
8  Q.  How often would he see his grandchildren?
9  A.  Every day.
10 Q.  How did he get along with his grandchildren?
11 A.  Great.
12         MR. SHOUDY: You're saying grandchildren. Do
13     you mean grandchild at that time?
14         THE WITNESS: Grandchild at that time.
15         MR. SHOUDY: Okay.
16         THE WITNESS: Yeah. That was his pride and
17     joy. They were inseparable.
18 BY MR. WILENSKY:
19 Q.  They were inseparable did you say?
20 A.  Yes.
21 Q.  All right. And then to your knowledge your dad did not
22     have a history -- he had a mental health history,
23     correct?
24 A.  Right.
25 Q.  All right. He had different addiction problems?

Page 52

1  A.  Right.
2  Q.  And those were longstanding, correct?
3  A.  Correct.
4  Q.  All right. If he answered in the questionnaire at
5      Sanilac County about prior suicide attempts yes, that's
6      not something you knew about?
7  A.  Correct.
8  Q.  Okay. And, of course, you were not with him when he
9      answered these questions?
10 A.  Correct.
11 Q.  Your dad was trying to call you on 20th, and you were
12     trying to return the calls. We've established that,
13     correct?
14         MR. SHOUDY: Actually --
15         THE WITNESS: The 21st.
16         MR. SHOUDY: -- I think he said the 21st is
17     when he tried to call.
18         MR. WILENSKY: No. I thought I said the
19     20th.
20 BY MR. WILENSKY:
21 Q.  Oh, your dad tried to call you on the 21st, but you had
22     -- those first calls you made?
23 A.  Yes.
24 Q.  There's three calls on the 20th?
25 A.  On the 20th, yes.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

Page 53

1   Q.   One where you hung up?
2   A.   Yes.
3   Q.   And two were fairly short, like one was one minute and
4        27 seconds and one was 56 seconds?
5   A.   Correct.
6   Q.   All right. You didn't get to talk to your dad on those
7        occasions, correct?
8   A.   Correct.
9   Q.   Was it that same Deputy Adamczyk?
10  A.   I don't think so. But I'm not 100 percent sure.
11  Q.   Male or female?
12  A.   Like I said before, I think it was probably one male
13       and one female. But I don't remember what their names
14       were.
15  Q.   All right. You said you specifically didn't recall
16       what you talked about. Do you have any general
17       remembrance of what you talked about?
18  A.   I'm pretty sure that I just wanted somebody to tell him
19       that I love him. And I was trying to get more
20       information, but they didn't have anything they could
21       tell me at that point.
22  Q.   Okay. You mentioned during your testimony that you
23       didn't use the words watch him, but you were concerned
24       about him.
25  A.   Yes.

Page 54

1   Q.   Okay. And you were there for the overdose?
2   A.   Yes.
3   Q.   All right. And the time lapse between the overdose --
4        I think you said that was on Saturday?
5   A.   Yes.
6   Q.   All right. And what day was he arrested?
7   A.   Sunday.
8   Q.   Had the purported crime already been committed when he
9        overdosed, or not?
10  A.   No.
11  Q.   Okay.
12  A.   The crime was the following morning from what I heard.
13  Q.   Okay. So what time -- I don't think we established the
14       time on Saturday. Was that day or evening --
15  A.   On Saturday it was about -- I want to say it was about
16       2:30, 3:00 p.m.
17  Q.   In the afternoon?
18  A.   Yes.
19  Q.   Okay. How long were you there before you left?
20  A.   Long enough to get him back alive and leave. It was
21       probably about 25, 30 minutes.
22  Q.   All right.
23  A.   Enough for me to see that he was going to be alive.
24  Q.   Okay. So that would have been -- Saturday was the 18?
25  A.   Yes.

Page 55

1   Q.   All right. And then the first on the 20th was 1:38. I
2        assume that's the afternoon?
3   A.   Yes.
4   Q.   All right. We've heard the audio of you mentioning the
5        overdose. That was on the 21st, that call, the longer
6        call?
7   A.   Yes.
8   Q.   Did the overdose get mentioned on the 20th, if you
9        remember?
10  A.   I can't guarantee that.
11          MR. WILENSKY: Okay. That's all I have.
12          MR. SHOUDY: Thank you, ma'am.
13          THE WITNESS: Thank you.
14          (The deposition was concluded at 2:42 p.m.
15          Signature of the witness was not requested by
16          counsel for the respective parties hereto.)

Page 56

                    CERTIFICATE OF NOTARY
STATE OF MICHIGAN  )
                   ) SS
COUNTY OF ST. CLAIR )

    I, Valerie Jo Lohr, C.S.R., certify that this
deposition was taken before me on the date hereinbefore
set forth; that the foregoing questions and answers
were recorded by me stenographically and reduced to
computer transcription; that this is a true, full and
correct transcript of my stenographic notes so taken;
and that I am not related to, nor of counsel to, either
party nor interested in the event of this cause.


                    VALERIE JO LOHR, CSR-6212
                    Notary Public,
                    St. Clair County, Michigan
                    My commission expires: May 23, 2020