UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT SHIMMEL, *Personal Representative of the Estate of Stephen Vance Shimmel*,

      Plaintiff,

v.

JOHN MOODY, *Lieutenant, Sanilac County Sheriff's Office*, et al.,

      Defendants.

Case No. 18-13334

Honorable Laurie J. Michelson
Magistrate Judge Elizabeth A. Stafford

---

**OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [22]**

---

Two days after he was arrested, 48-year-old Stephen Shimmel committed suicide in his jail cell. Stephen's brother, Robert Shimmel, sued four officers of the Sanilac County's Sheriff's Department under 42 U.S.C. § 1983. Plaintiff alleges that these officials violated the due process rights of his late brother by disregarding his serious medical need. The defendants—Lieutenant John Moody, Deputy Jeanie Adamczyk, Deputy Jason James, and Deputy Amy Verran—filed for summary judgment and, for the reasons explained below, the Court grants their motion.

**I.**

**A.**

The events that led to this tragic suicide began in the early morning of November 19, 2017, when Stephen Shimmel was arrested on charges of burglary and attempted armed

robbery.[1] Shimmel was an alleged conspirator in an armed robbery of a marijuana-growing operation. (ECF No. 22-2, PageID.127; *see also* Case No. 4:19-cr-20484.) Upon his arrest, police took him to the hospital because of concerns that he was hypothermic. (ECF No. 22-4, PageID.140–141.) While at the hospital, Shimmel tested positive for cocaine. (*Id.*) He was medically cleared on November 20 and booked into the Sanilac County Jail at 3:27 a.m. (*Id.*; ECF No. 22-5, PageID.145.)

Shimmel's daughter, Michelle, said in a deposition that her father had been in jail many times and had been addicted to heroin and crack cocaine "on and off, my whole life." (ECF No. 22-2, PageID.126–127.) After Stephen overdosed in 2016, he went to rehab and then moved in with Michelle and her child. (ECF No. 22-2, PageID.127.) "My dad disclosed multiple times that he wanted to live to be there for his grandchildren," Michelle said. (*Id.*) She said her father was "inseparable" from his grandchild, who was his "pride and joy." (ECF No. 22-2, PageID.134.) She was pregnant with her second child at the time of her father's death. (ECF No. 22-2, PageID.127.)

Stephen was off drugs for a period before getting involved with a drug user and spiraling back into addiction in 2016 and 2017, Michelle testified. (*Id.*) On November 18, 2017—just hours before the burglary—Stephen overdosed on heroin. (ECF No. 22-2, PageID.126–127.) His girlfriend, who had injected him with heroin, called Michelle to help keep him alive. (*Id.*) Michelle raced to her father's side to help him recover since no Narcan

---

[1] The Court refers to the decedent as "Stephen" (the name listed on the government identifications in the record) rather than "Steven" (the spelling in the complaint). And although the complaint lists the decedent as the plaintiff, Robert Shimmel is the personal representative of his late brother's estate and the actual plaintiff.

was available. (*Id.*) When asked if this incident was a suicide attempt, she responded, "I wouldn't say that at all." (ECF No. 22-2, PageID.127.)

## B.

During Shimmel's booking process, Deputy Felix Macias administered a suicide risk-assessment questionnaire that contained three questions relating specifically to suicide. (ECF No. 22-6, PageID.148.) Regarding any past suicide attempts by Shimmel, Deputy Macias wrote: "few years, attempted." (*Id.*) (Although not known to Macias, Shimmel had attempted suicide seven years earlier, in 2010, and was released from the hospital after a doctor determined that he was no longer suicidal. (ECF No. 22-3.)) When Shimmel was asked if he was "now contemplating suicide," he answered: "No." (*Id.*) Finally, Macias wrote "No" in response to the final question, "Does the inmate's behavior suggest a risk of suicide?" (*Id.*) The bottom of the form has an "X" next to "Suicidal"— which apparently is automatically generated if a person gives an affirmative answer to any of the three questions. (ECF No. 22-4, PageID.141; ECF No. 22-8, PageID.162.)

Elsewhere in that questionnaire, Shimmel answered that he had not recently experienced the death of a loved one, a major financial loss, or other major problems. (*Id.*) He also said that he previously had "been in a mental institution or had psychiatric care." (*Id.*) According to another intake form, Shimmel was a daily user of heroin and crack cocaine. (ECF No. 22-6, PageID.151.) He said that he suffered cold sweats and vomiting when detoxing from drugs. (ECF No. 22-6, PageID.150.) Macias wrote that Shimmel appeared "to be under the influence of barbiturates, heroin, or other drugs" but that his behavior did not suggest the need for immediate psychiatric or medical treatment. (ECF

No. 22-6, PageID.152.) Later, a nurse practitioner met with Shimmel and learned that he was taking Depakote (an anti-seizure medication) and Invega (for a mood disorder). (ECF No. 22-10, PageID.187.) That nurse contacted Walgreens, but the prescriptions on file for Shimmel were not current. (ECF No. 22-10, PageID.190.)

## C.

Shortly after 3 p.m. on November 21, Shimmel was arraigned on 11 felony charges, including two counts of assault with intent to murder. (ECF No. 22-13; ECF No. 24.)

Deputy Jeanie Adamczyk then processed Shimmel for placement in the general population of the jail. (ECF No. 22-14, PageID.206.) Adamczyk had not seen the other questionnaire. (*Id.*) The placement questionnaire that she administered did not include any questions about suicide specifically. (ECF No. 22-15.) During the interview, she considered risk factors for suicide, such as "whether they're looking at the future or they're acting hopeless." (ECF No. 22-14, PageID.211.) "He was talking like he was looking at the future," Adamczyk later recalled. (*Id.*) According to Adamczyk, Shimmel said, "I only have to do 10 years and then I can get back out there with my grandkids." (*Id.*) Shimmel said there was not any prescription medication that he was supposed to be taking. (ECF No. 22-15, PageID.215.)

When Shimmel was asked if he had any "medical problems we should be aware of," his only comment was "seizures." (*Id.*) In one response to the questionnaire, Shimmel indicated that he had previously received mental health services and had been diagnosed as "Homicidal/Suicidal/Bipolar/Antisocial disorder/PTSD." (*Id.*) Adamczyk classified

Shimmel as "close custody and high medium," which she described as keeping a "closer eye" on the inmate. (ECF No. 22-14, PageID.208.)

Adamczyk spoke with Michelle Shimmel twice that day. (ECF No. 22-2, PageID.129–130.) Michelle first called in the morning to ask about her father's arraignment and the jail's visitation policy. (*Id.*) At 4:36 p.m., Michelle again reached Adamczyk, who informed her of her father's 11 charges and said there would be a probable cause hearing the next week. (ECF No. 22-2, PageID.130.)

On that second call, Michelle told Adamczyk that her father had overdosed on heroin on November 18, several hours before his arrest. (*Id.*) She continued: "So I know that he was probably very angry. He had no Narcan or nothing, and he was dead for at least five minutes." (*Id.*) Michelle never told Adamczyk that she believed her father was suicidal; in fact, as she said in her deposition, she was not aware of his past suicide attempt and he had "never been suicidal to my knowledge." (ECF No. 22-2, PageID.126,133.)

Adamczyk conveyed to Lieutenant Moody that Shimmel had suffered a drug overdose three days earlier. (ECF No. 22-9, PageID.175.) She advised Moody to watch Shimmel for withdrawal symptoms and suggested that officers ask how he was feeling when they performed their checks. (ECF No. 22-14, PageID.211–212.)

Around the time of this phone call, Shimmel met with Moody, who spoke to him about his cell assignment. (ECF No. 22-4, PageID.142.) In that conversation, Moody recalled, Shimmel "did not give me any indication that he was suicidal." (*Id.*) Shimmel stated that he neither wanted to be placed with a lot of people nor to be alone in a cell. (*Id.*) Shimmel also told him that "he was going to be able to either beat this charge or he was

going to do 10 years" and that his "grandchild will still be able to know him and have a good life with him." (ECF No. 22-9, PageID.181–182.)

Moody assigned Shimmel to a cell in a maximum-security area that was far from the cell of his alleged co-conspirator. (ECF No. 22-4, PageID.142.) Shimmel was not placed on suicide watch, which would have included round-the-clock monitoring by a deputy. (*Id.*; ECF No. 22-9, PageID.175) Moody explained in an affidavit that officers place an inmate on suicide watch if the person is currently considering suicide or an officer found his behavior to indicate a risk of suicide. (ECF No. 22-4, PageID.142.) Although he was aware of Shimmel's responses to the suicide risk assessment, Moody said, "a large number" of inmates have a history of suicide attempts. (ECF No. 22-4, PageID.141–142.) A report that an inmate has attempted suicide in the past, without more, "may prompt further review" only if that attempt was "very recent," he said. (ECF No. 22-4, PageID.142.) In Moody's 23 years in the department, there had never been a suicide at the jail. (ECF No. 22-9, PageID.170.)

Shimmel was placed alone in his cell, which had a common area that he shared with another inmate when the cells were unlocked. (ECF No. 22-4, PageID.142–143.) Shimmel's cell included a toilet in the back corner. (ECF No. 22-4, PageID.143.) Although a camera covered roughly 90 percent of the cell, it did not include the toilet area. (*Id.*)

### D.

The jail's written policy requires a visual check of each inmate every 30 minutes. (ECF No. 22, PageID.94; ECF No. 25, PageID.388.) But in practice, Moody explained, deputies are expected to check each cell twice an hour rather than once every half hour.

6

(ECF No. 22-9, PageID.178.) Moody said this policy difference exists because it would be "impossible" for officers to space their visits exactly 30 minutes apart and also because such precision would give the inmates too much warning. (*Id.*)

Deputy Jason James locked the doors of Shimmel's cell at about 8:30 p.m. (ECF No. 22-16, PageID.220.) Deputy Jennifer Morden performed a wellbeing check at 8:34 p.m. (ECF No. 22-18, PageID.230.) At that time, Shimmel asked if he could go to the common area to use the phone. (*Id.*) Morden responded that she would ask Moody and let Shimmel know during the next check. (*Id.*) Eighteen minutes later, at 8:52 p.m., Deputy James performed a wellbeing check. (ECF No. 22-16, PageID.221.) He had a brief conversation with Shimmel, who said he would like to use the phone soon. (*Id.*)

When James returned 44 minutes later, at 9:36 p.m., he saw that Shimmel had hanged himself with a sheet tied to the bars near the toilet. (ECF No. 24, Ex. B.) James immediately used a tool to free Shimmel from the sheet, and he and another officer performed CPR and other lifesaving efforts. (ECF No. 22-8, PageID.163.) More officers soon arrived and, despite exhaustive efforts, could not save Shimmel's life. (*Id.*) At 9:59 p.m., Shimmel was pronounced dead. (ECF No. 22-19, PageID.239.)

### E.

Deputy Amy Verran was the officer who worked in the jail's command center that night. (ECF No. 22-21, PageID.253.) Her main responsibility was to monitor the jail's video monitors—which included more than 40 cameras of the cells and the "catwalk" areas between the cells—observing the inmates as well as deputies and members of the public. (ECF No. 22-4, PageID.143; ECF No. 22-21, PageID.253, 255.) Moody had told Verran

to "keep an eye" on Shimmel because "he was new to the facility." (ECF No. 22-21, PageID.255.) So she watched how he interacted with the inmate next to him, but she "had no idea about his classification or anything." (*Id.*) Verran had the video from Shimmel's cell on one of the 12 screens close to her eye level. (ECF No. 22-21, PageID.254.) Because there are so many screens to watch, she said, "it's hard to focus on one particular camera the whole entire time." (ECF No. 22-21, PageID.254–255.)

The videos provided to the Court depict some portion of what happened that night. At 8:33 p.m., Shimmel stared at the camera in his cell and unsuccessfully tried to cover it with a shirt or other object. (ECF No. 24, Ex. B.) Between 8:34 p.m. and 9:09 p.m., Shimmel alternated between lying in his bed and walking around his cell (and twice talking to deputies). (*Id.*) Then, Shimmel moved toward the back of his cell and was not visible from the cell's camera. (*Id.*) At 9:10 p.m., Shimmel reappeared on the video as he fell to the floor in what was later inferred to be a suicide attempt; outside investigators who watched the videos afterward concluded that "you can see his body fall limp and fall to the ground and he laid on the ground next to the bunk." (*Id.*; ECF No. 22-8, PageID.163.) Shimmel got to his feet within several seconds, remaining visible on screen, and then lay in his bed. (ECF No. 24, Ex. B.) At 9:22 p.m., he walked toward the toilet in the back of the cell and no longer could be seen from the cell's camera. (*Id.*) At around the same time, Shimmel placed a sheet through the bars near the toilet, an action that faintly could be seen in a small corner of the video covering the catwalk. (*Id.*) Meanwhile, the jail cell video continued to show only Shimmel's empty bed and part of his blanket until 9:36 p.m., when Deputy James rushed into the cell. (*Id.*)

Deputy Verran remembered seeing James' 8:52 p.m. wellbeing check on one of her screens. (ECF No. 22-21, PageID.254.) But she did not see Shimmel's attempt to cover the cell camera or his fall to the floor at 9:10 p.m.; had she noticed the inmate fall to the floor, she said she probably would have asked the deputy to check on him. (*Id.*) Later, Verran saw Shimmel leave the area covered by the cell's camera, which she said was "not unusual" since that area includes the toilet. (*Id.*) She did not have the video of the catwalk area displayed on her screens. (*Id.*) Overall, she did not notice anything "unusual" until Shimmel's body was discovered at 9:36 p.m. (ECF No. 22-21, PageID.255–256.)

One of the outside investigators testified, "[I]f you look at [the footage] as a whole . . . you can put risk factors in there. But as you're watching it, if you're watching it live, I wouldn't see a risk factor in there." (ECF No. 22-22, PageID.263.)

## F.

As for Michelle Shimmel, she was "in shock" when she learned that her father had committed suicide in jail. (ECF No. 22-2, PageID.132.) She "didn't think he was suicidal." (ECF No. 22-2, PageID.133.) Although she had been concerned with how he would respond to the lengthy list of criminal charges due to his recent overdose and a history of mental health problems, she did not believe that her father would take his own life. (*Id.*) "I never would expect something like that from my dad, especially in jail," she said. (ECF No. 22-2, PageID.132.) She added that "he felt more safe" while incarcerated than when he was in the outside world. (*Id.*) Although the complaint stated that Michelle had warned jail staff "several times" that he "should be watched for suicide attempts," the recordings

of the phone conversations with Adamczyk show that she never made such statements. (ECF No. 1, PageID.3; ECF No. 22-2, PageID.129–130.)

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' only if its resolution will affect the outcome of the lawsuit." *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 451–52 (6th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). And a "dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Scott v. First S. Nat'l Bank*, 936 F.3d 509, 516 (6th Cir. 2019) (internal citations omitted).

## III.

### A.

Under the Eighth Amendment's Cruel and Unusual Punishment Clause, prison officials can be liable for damages if they are deliberately indifferent to a convicted prisoner's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). But because a pretrial detainee has not been convicted of a crime, no punishment of any kind is permitted. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979). For pretrial detainees, the Due Process Clause of the Fourteenth Amendment protects them from officials' deliberate indifference to their serious medical needs. *See Bays v. Montmorency Cty.*, 874 F.3d 264, 268 (6th Cir. 2017) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 243–44 (1983)).

The Sixth Circuit has long held that such a claim of deliberate indifference contains both objective and subjective components. *See Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005); *Barber v. City of Salem*, 953 F.2d 232, 239–40 (6th Cir. 1992). "The line between negligence and deliberate indifference is particularly difficult to draw when the risk at issue is suicide because the officials will necessarily be accused of a failure to act, which usually falls in the domain of negligence." *Cooper v. Cty. of Washtenaw*, 222 F. App'x 459, 466 (6th Cir. 2007). Regarding suicides in particular, the question is "whether the decedent showed a strong likelihood that he would attempt to take his own life in such a manner that failure to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs." *Gray*, 399 F.3d at 616 (quoting *Barber*, 953 F.2d at 239–40). Put another way, the objective component requires proof of "a strong likelihood" that the detainee would attempt suicide; the subjective component is satisfied when an official drew such an inference but disregarded it by failing to take adequate precautions. *See Galloway v. Anuszkiewicz*, 518 F. App'x 330, 333 (6th Cir. 2013). "[T]he test is a *strong likelihood* of suicide" and not "some *possibility* of suicide, or even a *likelihood* of suicide." *Id.* at 336.

A particularly relevant case is *Barber v. City of Salem*, 953 F.2d 232 (6th Cir. 1992). In that case, Kenneth Barber was jailed for driving under the influence and operating a vehicle without a valid license. *See id.* at 233. One officer told Barber, "If I had my way, you will get six months to a year." *See id.* at 233–34. Bond was set at $300, which Barber could not afford. *See id.* at 234. According to his fiancée, Barber was worried that a long jail stay could jeopardize their relationship as well as his job and the custody of his child.

*See id.* Barber committed suicide the next morning, more than five hours after the previous jail inspection. *See id.* A coroner's investigation concluded that Barber was "apparently overwrought over [his] recent arrest" and was still intoxicated at the time of his suicide. *See id.* Nevertheless, the Sixth Circuit concluded that the claims of deliberate indifference could not survive summary judgment. *See id.* at 240. The worries that Barber expressed upon being jailed "could not be considered abnormal and would not alert the jail authorities to a strong likelihood" of a suicide attempt. *Id.*

Another leading case is *Perez v. Oakland County*, 466 F.3d 416 (6th Cir. 2006). Unlike in *Barber*, the court held that a genuine issue of fact remained as to whether the inmate demonstrated a strong likelihood of attempting suicide. *See Perez*, 466 F.3d at 424. Ariel Perez, Jr. had attempted suicide multiple times in the past (including just a month earlier), had stopped taking his prescribed psychotropic medication, and had previously been placed on suicide watch in the jail. *See id.* at 424–25. Although Perez had denied feeling suicidal in his most recent psychological evaluation, the Court held that a reasonable jury could find that officials disregarded the recently suicidal inmate's strong likelihood of another suicide attempt. *See id.* at 425.

Other cases help set the bar that a plaintiff must clear to show that a strong likelihood of suicide existed. A jail official's knowledge that a detainee had been suicidal sometime in the past does not meet the standard. *See, e.g.*, *Mantell v. Health Professionals Ltd.*, 612 F. App'x 302, 307 (6th Cir. 2015) (holding that officials were not deliberately indifferent when they "had only a bald report of concern on the part of [the inmate's] estranged girlfriend and [his] own report, made during his medical assessment, of treatment for

depression and a single suicide attempt some five years in the past"). Likewise, another court found that no trier of fact could find that a treating physician was deliberately indifferent to a serious medical need when he "determined through his own direct evaluation that Plaintiff was not suicidal, finding no evidence of helplessness, hopelessness, death wishes, suicidal thoughts or plans, but that, *to the contrary, Plaintiff appeared upbeat and looking to the future*." *Perez v. Oakland Cty.*, 380 F. Supp. 2d 830, 845 (E.D. Mich. 2005) (emphasis added) (internal quotation marks omitted), aff'd, 466 F.3d 416 (6th Cir. 2006); *see also Linden v. Washtenaw Cty.*, 167 F. App'x 410, 421 (6th Cir. 2006) (listing "hopelessness, helplessness, and worthlessness" as examples of suicide risk signs).

## B.

Despite the authority regarding the legal framework in suicide cases, Shimmel argues that objective unreasonableness is the correct standard for his claim in the wake of *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015). (ECF No. 25, PageID.394.) The defendants disagree. (ECF No. 27, PageID.409–411.)

In *Kingsley*, reviewing a pretrial detainee's claim of excessive force, the Supreme Court held that "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 135 S. Ct. at 2473. So a jury in such a case should not "weigh [officers'] subjective reasons for using force." *Id.* at 2477.

*Kingsley* involved a claim of excessive force—not, as here, a claim that officers did not adequately treat a detainee's serious medical needs. Whether the reasoning of *Kingsley* extends to such claims, thereby changing the subjective intent component, has not been

decided by the Sixth Circuit. *See Martin v. Warren Cty.*, No. 19-5132, 2020 WL 360436, at *4 n.4 (6th Cir. Jan. 22, 2020) ("Whether an objective standard applies to pretrial detainee claims of deliberate indifference and what the standard entails are open questions. . . . [W]e leave the *Kingsley* question for another day."); *Richmond v. Huq*, 885 F.3d 928, 937 n.3 (6th Cir. 2018) (stating that *Kingsley* "calls into serious doubt" whether a plaintiff still must show that a defendant was "subjectively aware of her serious medical conditions"). Nevertheless, some recent unpublished Sixth Circuit opinions about deliberate indifference in this context have continued to include the pre-*Kingsley* subjective prong. *See, e.g.*, *McCain v. St. Clair Cty.*, 750 F. App'x 399, 403 (6th Cir. 2018); *Medley v. Shelby Cty.*, 742 F. App'x 958, 961 (6th Cir. 2018).

The issue has created a split among the circuits that have explicitly decided the question. Whereas three courts of appeal have held that *Kingsley* did not impact the standard for a Fourteenth Amendment claim of inadequate medical care, *see Whitney v. City of St. Louis*, 887 F.3d 857, 860 n.4 (8th Cir. 2018); *Dang ex rel. Dang v. Sheriff, Seminole Cty.*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017); *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419 n.4 (5th Cir. 2017), three other courts of appeal have changed their standards in light of *Kingsley*, *see Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018); *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017); *Castro v. Cty. of L.A.*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc).

Plaintiff urges this Court to use the same factors as the District Court in *Love v. Franklin County*, 376 F. Supp. 3d 740, 747 (E.D. Ky. 2019) (order denying motion to dismiss), which adopted language from the Second Circuit's two-prong test. Under that

standard, plaintiff must establish (1) that he suffered a serious medical condition and (2) that the defendant "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. In other words, a plaintiff has to prove that "the official *should have known* of the inmate's serious medical needs or substantial risk of serious harm and failed to take reasonable measures to address the risk, rather than that the official had *actual knowledge* and failed to take such reasonable measures." Kyla Magun, A Changing Landscape for Pretrial Detainees? The Potential Impact of *Kingsley v. Hendrickson* on Jail-Suicide Litigation, 116 Colum. L. Rev. 2059, 2063 (2016).

Based on the facts of this case, the Court "need not resolve or wrestle further with this thorny issue." *Johnson v. Clafton*, 136 F. Supp. 3d 838, 844 (E.D. Mich. 2015); *accord Williams v. City of Georgetown*, 774 F. App'x 951, 955 n.2 (6th Cir. 2019); *Preston v. Cty. of Macomb*, No. 18-12158, 2019 WL 3315280, at *5 n.5 (E.D. Mich. July 24, 2019). Under either standard, Shimmel's claims against the four officers cannot survive summary judgment. The case law is clear that a detainee at least must have demonstrated an obvious risk of serious harm in order for a jail official to be liable for his suicide. *Gray*, 399 F.3d at 616 ("strong likelihood that he would attempt to take his own life"); *Darnell*, 849 F.3d at 35 ("excessive risk to health or safety"). Here, no reasonable jury could find that any of the four defendants knew or should have known of a strong likelihood that Shimmel would attempt suicide and then recklessly failed to act with reasonable care to mitigate that risk.

## IV.

Regarding all four defendants, Plaintiff's brief states: "Having knowledge and then ignoring the risk that comes from such knowledge is deliberative [sic] indifference." (ECF No. 25, PageID.399.) But as discussed below, none of the four defendants knew or should have known that Shimmel would likely attempt suicide. Upon intake, Shimmel said he was not contemplating suicide. The officers who performed cell checks and were watching videos did not see anything unusual. Contrary to Plaintiff's complaint, Shimmel's daughter *did not* call the jail to warn officials that Shimmel was suicidal—and she herself was "in shock" that he took his own life. Although each defendant possibly could have seen tragic warning signs in retrospect, none is liable for objective or subjective deliberate indifference to Shimmel's serious medical needs.

### A. Deputy Adamczyk

No reasonable jury could find that Deputy Adamczyk knew—or even should have known—of a strong likelihood that Shimmel would attempt suicide.

Adamczyk noted that Shimmel was envisioning his future and told her, "I only have to do 10 years and then I can get back out there with my grandkids." Shimmel did not make her aware of any current medical problems except for his seizures. Shimmel's daughter informed Adamczyk that Shimmel had overdosed on heroin on November 18, but she did not indicate any concern that he was suicidal. As a reasonable officer would do, Adamczyk passed this information along to Lieutenant Moody out of concern that Shimmel might be detoxing. The only time that Adamczyk became aware of Shimmel's suicidal history was when he told her that he was once diagnosed as

"Homicidal/Suicidal/Bipolar/Antisocial disorder/PTSD." She never knew that Shimmel had attempted suicide in 2010.

Still, even if Adamczyk had been aware of a possibility or some likelihood of suicide, that clearly would fall short of an objectively "strong" likelihood. *See Galloway*, 518 F. App'x at 336. As the Sixth Circuit has repeatedly held, being suicidal in the past (and even attempting suicide once) is not enough to meet the bar of a strong likelihood. *See Mantell*, 612 F. App'x at 307. Nor does being intoxicated or emotionally agitated necessarily alert jail authorities to such a likelihood. *See Barber*, 953 F.2d at 234. By contrast, Shimmel appeared to Adamczyk to be upbeat and looking to the future, characteristics that do not generally indicate a strong likelihood of suicide. *See Linden*, 167 F. App'x at 421; *Perez*, 380 F. Supp. 2d at 845. So plaintiff cannot prove the objective prong of the deliberate indifference claim regarding Adamczyk.

Plaintiff notes that Adamczyk did not review the suicide risk-assessment questionnaire completed by Deputy Macias, she did not ask Shimmel's daughter about his suicide risk, and she did not "clearly convey" the conclusions of her classification interview to Lieutenant Moody. (ECF No. 25, PageID.400.) But these three examples do not add up to a reckless failure to act with reasonable care to mitigate a strong likelihood of suicide. In those three separate instances, Adamczyk did not recklessly disregard the risk of suicide because 1) reviewing the suicide risk assessment would not have alerted a reasonable person to a strong likelihood of suicide, 2) Shimmel's daughter *did not think* her father was suicidal, and 3) not clearly conveying something is not akin to recklessness.

So Plaintiff has not created a fact issue. Even under Plaintiff's proposed standard, Deputy Adamczyk is entitled to summary judgment.

## B. Lieutenant Moody

For many of the same reasons as Deputy Adamczyk, Lieutenant Moody is entitled to summary judgment.

To recap, Moody was aware of Shimmel's recent heroin overdose. Moody also was told by Shimmel that he would either "beat this charge" or serve his sentence in 10 years so that his grandchild could still have a good life with him. But, he recalls, Shimmel "did not give me any indication that he was suicidal."

Moody said that many inmates arrive at the jail with a history of suicide attempts but, since Moody began at the sheriff's office in 1994, no other inmate has committed suicide. A detainee is placed on suicide watch if he is currently considering suicide, if his behavior prompts a reviewing officer to find a suicide risk, or perhaps if he had a very recent suicide attempt. None of those factors occurred here. Overall, Moody did not have evidence of an objectively "strong likelihood" that Shimmel would attempt suicide. *Cf. Perez*, 466 F.3d at 424–25 (denying summary judgment when an inmate had recently and frequently attempted suicide, abstained from taking psychological medication, and had previously been on suicide watch in the same jail).

Even under a looser standard, Plaintiff's claims also fall short. Plaintiff argues that Moody could be liable for the following reasons: he had knowledge of the questionnaires, he had knowledge of Shimmel's daughter's "warning call," he did not get Shimmel evaluated for counseling, he did not put Shimmel on suicide watch, and he did not

communicate all that he knew to Deputy Verran. (ECF No. 25, PageID.399–400.) Yet, the content of the questionnaires suggested that Shimmel was not suicidal and the phone call—in which Shimmel's daughter *did not warn* that her father was suicidal, as he had "never been suicidal to [her] knowledge"—does not mean that Lieutenant Moody knew or should have known of a strong likelihood of suicide. And so not requesting counseling, not placing Shimmel on suicide watch, and not communicating more with an officer cannot amount to recklessly disregarding a strong likelihood of a suicide attempt. Plaintiff cannot show that Moody's actions constituted a reckless failure to act with reasonable care.

## C. Deputy James

Likewise, Plaintiff has not shown that a reasonable jury could find that Deputy James violated Shimmel's Fourteenth Amendment rights.

Plaintiff's sole argument relating to Deputy James is that he "did not do his cell checks on time in violation of the" written policy. (ECF No. 25, PageID.400.) The defendants concede that the written policy requires observation every 30 minutes. (ECF No. 22, PageID.94.) In practice, as Lieutenant Moody explained, deputies are supposed to visit each cell twice within each hour. That way, the checks are more effective because the inmates are not warned as to the precise timing.

Regarding the officers' checks on Shimmel, they made three visits to his cell in the period of one hour and two minutes. As the defendants acknowledge, 44 minutes elapsed between the final two checks. Deputy Morden checked Shimmel's cell at 8:34 p.m., Deputy James checked at 8:52 p.m. (and spoke to Shimmel about using the phone), and James

checked again at 9:36 p.m. Had James checked exactly 30 minutes after his 8:52 visit, he indeed might have spotted Shimmel's efforts to commit suicide.

But James' decision to visit Shimmel's cell after 44 minutes rather than 30 minutes was not a constitutional violation. Plainly, James did not know about Shimmel's risk of suicide (or lack thereof). Nor does plaintiff present any reasons why James *should have* known. There is no evidence that Deputy James was aware of or had a duty to be aware of Shimmel's medical history, the fact that he had recently survived a heroin overdose, or any warnings that he was suicidal. An officer cannot be held liable for recklessly disregarding a risk about which he did not know and should not have known. And even though James failed to visit Shimmel for 44 minutes, that at most amounts to negligence rather than recklessness. So he, too, is entitled to summary judgment.

### D. Deputy Verran

Regarding Deputy Verran, who sat in the command center, Defendants argue that there is at most "a weak negligence claim" rather than liability for deliberate indifference. (ECF No. 22, PageID.110.) Plaintiff responds that Verran could be liable for deliberate indifference because she did "not keep her eyes on Mr. Shimmel, and ignor[ed] clear video evidence of risk/danger signs including a failed suicide attempt." (ECF No. 25, PageID.400.) The Court agrees with Defendants that Verran is entitled to summary judgment.

Verran was tasked with monitoring more than 40 video screens. The footage from inside Shimmel's cell was displayed on one of the 12 screens directly in front of her since, per Lieutenant Moody's instructions, she kept an eye on Shimmel because he was new to

the jail. But Verran had never been told that Shimmel was a suicide risk (and, indeed, Lieutenant Moody did not believe him to be a suicide risk and did not place him on suicide watch). Nor did she know anything else about Shimmel's medical history. She did observe some of Shimmel's actions in his cell, including his 8:52 p.m. discussion with Deputy James. But she did not notice anything unusual in the period before Shimmel was found dead.

To be sure, Verran failed to see the live video of Shimmel's 9:10 p.m. fall to the floor, which investigators determined (in an after-the-fact review) to have been a failed suicide attempt. And had she seen that suspicious footage, she testified, she probably would have asked for a cell check. Yet, it is undisputed that Verran was not watching that video at that exact moment. By comparison, she *did* observe Shimmel leave the area covered by the camera in his cell and head toward the back part of his cell just 12 minutes later, at 9:22 p.m., which she said was not unusual because of the location of the toilet. Verran also did not see the video of the catwalk around the same time—which showed a piece of a sheet in a small corner of the screen—because that feed was not displayed on her screens at that time.

In sum, Verran observed some of the activity in Shimmel's cell during the relevant time period while, at other times, she was focusing on another of the myriad cameras in the jail facility. Had she watched the video from Shimmel's cell more intently, she might have seen Shimmel's fall to the ground at 9:10 p.m. In hindsight, it is possible that Verran would have become aware of a problem and would have sent someone to check on Shimmel before he took his life.

But the claim against Verran should not reach a jury. Plaintiff is incorrect to say that Verran ignored clear evidence of danger signs—because her undisputed testimony is that she never saw Shimmel's 9:10 p.m. fall. She plainly did not know of a strong risk that Shimmel would attempt suicide. And, as she had to monitor more than 40 screens, did not have the ability to focus solely on one inmate. Under the existing Sixth Circuit standard, Verran cannot be liable because she had no knowledge of a strong likelihood of suicide and was not deliberately indifferent toward such a risk.

Even under the test proposed by Plaintiff, Verran did not violate Shimmel's Fourteenth Amendment rights. Suppose a reasonable deputy in the command center would have seen Shimmel's limp fall to the ground or the faint image of a sheet pulled through the cell bars. To be liable for damages, a reasonable official also should have known that there was "an *excessive risk* to the health or safety" of Shimmel and then recklessly failed to act. *See Darnell*, 849 F.3d at 35 (emphasis added). Shimmel's behaviors might have alerted a reasonable person to something suspicious or perhaps some possibility of a suicide risk. But plaintiff has not explained how those actions would have "alert[ed] the jail authorities to a strong likelihood" of a suicide attempt. *See Barber*, 953 F.2d at 240. Nor can he demonstrate that Verran's failure to act—by not requesting an extra cell check between 9:10 and 9:36, for example—was reckless rather than simply negligent. As an outside investigator testified, "you can put risk factors in there" in retrospect, but an observer watching the footage live "wouldn't see a risk factor" at the time.

Thus, summary judgment in Verran's favor is also appropriate under any standard.

## V.

In conclusion, the Court finds that all four defendants (Lieutenant John Moody, Deputy Jeanie Adamczyk, Deputy Jason James, and Deputy Amy Verran) are entitled to judgment as a matter of law. The motion for summary judgment is hereby GRANTED, and the case is DISMISSED.

SO ORDERED.

Dated: February 4, 2020

<u>s/Laurie J. Michelson</u>
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE